# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

CALVIN HOWARD, ET AL.                    CIVIL ACTION

VERSUS                                   NO.  13-4811
                                         c/w 13-6407 and 14-1188

OFFSHORE LIFTBOATS, LLC,
ET AL.                                   SECTION "E" (5)

## ORDER AND REASONS

Before the Court is Plaintiffs' motion *in limine* to exclude or limit certain testimony of Dr. Kevin Greve, an expert in neuropsychology retained by Defendants Offshore Liftboats, LLC ("OLB"), and K&K Offshore, LLC (collectively, "Defendants").[1] Defendants oppose the motion.[2] The Court held a *Daubert* hearing and oral argument on December 8, 2015,[3] and the parties have submitted extensive briefing with respect to the motion.[4] The Court has considered these briefs, the record, and the applicable law, and now issues its ruling.[5] For the reasons that follow, the motion *in limine* is **DENIED**.

## BACKGROUND

This is a maritime personal injury case. It is undisputed that, on May 16, 2013, Plaintiffs Raymond Howard ("Raymond") and Calvin Howard ("Calvin") were injured during a personnel-basket transfer from the M/V Contender to the deck of the L/B Janie.[6] At the time of the accident, both Raymond and Calvin were employed by Offshore Liftboats, LLC ("OLB"), the owner and/or operator of the L/B Janie.[7] The M/V Contender

---

[1] R. Doc. 346.
[2] R. Docs. 377, 385.
[3] *See* R. Doc. 433.
[4] R. Doc. 448, 460, 489.
[5] On January 24, 2016, the Court informed the parties that Dr. Greve would be permitted to testify in this matter. This Order and Reasons provides the reasons for the Court's ruling.
[6] *See* R. Doc. 321.
[7] *See generally* R. Doc. 321.

was owned and/or operated by K&K Offshore, LLC.[8] As a result of the accident, both Raymond and Calvin filed suit against OLB—their Jones Act employer—and K&K Offshore, among others.

On October 30, 2015, Plaintiffs Raymond Howard and Calvin Howard filed the present motion *in limine* with respect to the proposed testimony of Dr. Kevin Greve.[9] Dr. Greve is a practicing neuropsychologist in Metairie, Louisiana, and was retained as an expert in this matter by the Defendants, OLB and K&K Offshore.[10] Dr. Greve, a neuropsychologist, examined Plaintiffs Raymond Howard and Calvin Howard and has authored expert reports with respect to both Plaintiffs. In the present motion *in limine*, Plaintiffs contest Dr. Greve's opinions that the Plaintiffs are "malingering," as well as the methodology he employed in reaching those opinions. In sum, Plaintiffs contend Dr. Greve's methodology fails to meet the standards for the admissibility of expert testimony prescribed by Federal Rule of Evidence 702 and the Supreme Court's landmark decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[11] The Plaintiffs also argue that Dr. Greve's opinions with respect to "malingering" are irrelevant, constitute impermissible character evidence, and have a probative value which is substantially outweighed by the danger of unfair prejudice.[12]

## LEGAL STANDARD

The Federal Rules of Evidence permit an expert witness with "scientific, technical or other specialized knowledge" to testify if such testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," so long as "the testimony is based

---

[8] *See generally* R. Doc. 321.
[9] R. Doc. 346.
[10] R. Doc. 385 at 3.
[11] R. Doc. 346-1 at 9–21.
[12] R. Doc. 346-1 at 22.

upon sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case."[13] The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[14] provides the analytical framework for determining whether expert testimony is admissible under Rule 702. Under *Daubert*, courts, as "gatekeepers," are tasked with making a preliminary assessment of whether expert testimony is both relevant and reliable.[15] The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant.[16]

The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid."[17] In *Daubert*, the Supreme Court enumerated several non-exclusive factors that courts may consider in evaluating the reliability of expert testimony.[18] "These factors are (1) whether the expert's theory can or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[19]

The Supreme Court has cautioned that the reliability analysis must remain flexible: the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his

---

[13] FED. R. EVID. 702.
[14] 509 U.S. 579 (1993).
[15] *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993)).
[16] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).
[17] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).
[18] *Daubert*, 509 U.S. at 592–96.
[19] *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94).

testimony."[20] Thus, "not every *Daubert* factor will be applicable in every situation . . . and a court has discretion to consider other factors it deems relevant."[21] In sum, the district court is offered broad latitude in making expert testimony determinations.[22]

As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility and should be left for the finder of fact.[23] "Unless wholly unreliable, the data on which the expert relies goes to the weight and not the admissibility of the expert opinion."[24] Thus, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[25] The Court is not concerned with whether the opinion is correct, but whether the preponderance of the evidence establishes that the opinion is reliable.[26] "It is the role of the adversarial system, not the court, to highlight weak evidence."[27]

## DISCUSSION

The motion *in limine* is based on two grounds. First, Plaintiffs' challenge Dr. Greve's proposed malingering testimony under Federal Rule of Evidence 702 and the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.* Second, Plaintiffs challenge Dr. Greve's proposed malingering testimony under Federal Rules of Evidence 402 and 403. The Court will address the motion with respect to each Plaintiff, individually.[28] The

---

[20] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).
[21] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004).
[22] *See, e.g., Kumho Tire*, 526 U.S. at 151–53.
[23] *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004).
[24] *Rosiere v. Wood Towing, LLC*, No. 07-1265, 2009 WL 982659, at *1 (E.D. La. Apr. 8, 2009) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)) (emphasis added); *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011 WL 1673805, at *6 (E.D. Pa. May 4, 2011).
[25] *Pipitone*, 288 F.3d at 250 (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted).
[26] *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).
[27] *Primrose*, 382 F.3d at 562.
[28] Dr. Greve administered neuropsychological tests to both Plaintiffs. The motion *in limine* was filed on behalf of both Plaintiffs, but the arguments centered on Dr. Greve's opinions with respect to Calvin.

Court will, as an initial matter, provide some context with respect to the proposed testimony of Dr. Greve which the Plaintiffs challenge. The Court will then address, in turn, each ground of the motion *in limine* to exclude that proposed testimony.

I.   CALVIN HOWARD

   A.   PERTINENT OPINIONS & PROPOSED TESTIMONY OF DR. GREVE

As stated above, the Defendants retained Dr. Kevin Greve as an expert in the field of neuropsychology. On December 2–3, 2014, Dr. Greve administered a battery of neuropsychological tests to Calvin Howard.[29] Those tests included, among others, certain performance validity tests, such as: (1) the Portland Digit Recognition Test; (2) the Test of Memory Malingering; and (3) the Word Memory Test.[30] According to Dr. Greve, these tests are designed to detect whether a person is, or is not, malingering.[31] More specifically, the tests are "standardized and well-research[ed] forced-choice performance validity tests that have been specifically designed to detect attempts to appear more cognitively impaired than is actually the case."[32]

Dr. Greve issued his report with respect to Calvin Howard on July 16, 2015. Based on Calvin's performance on the tests, Dr. Greve opined that Calvin's "presentation more than meets the published criteria for a diagnosis of malingering."[33] Dr. Greve further concluded: "Mr. Howard meets published criteria for a diagnosis of malingering. There is evidence of intentional exaggeration of cognitive deficits, psychological and physical symptoms, and physical disability."[34] In light of Dr. Greve's opinion that Calvin is

---

[29] R. Doc. 346 at 8.
[30] R. Doc. 346-3 at 17 (Expert Report of Dr. Kevin Greve).
[31] R. Doc. 377-11 at 5.
[32] R. Doc. 346-3 at 16 (Expert Report of. Dr. Kevin Greve).
[33] R. Doc. 346-3 at 25 (Expert Report of Dr. Kevin Greve).
[34] R. Doc. 346-3 at 26–27 (Expert Report of Dr. Kevin Greve). Dr. Greve's expert report contains several additional opinions with respect to Calvin, *see* R. Doc. 346-3 at 26–27 (Expert Report of Dr. Kevin Greve), but Calvin does not challenge those opinions in the present motion *in limine. See generally* R. Doc. 346-1.

malingering, as well as his concerns with respect to the methodology underlying that opinion, Calvin filed this motion *in limine* on November 10, 2015.[35]

      B.    FEDERAL RULE OF EVIDENCE 702 & *DAUBERT*

Calvin does not challenge Dr. Greve's qualifications, in general, or whether he possesses the requisite knowledge to qualify as an expert in the field of neuropsychology.[36] Instead, Calvin attacks the methodology Dr. Greve employed in reaching his conclusion that Calvin is malingering.[37] Calvin contends, in sum, that Dr. Greve's methodology underlying that conclusion is flawed, and thus unreliable, because he "destroyed key raw data underlying his opinions [and] repeatedly failed to cite specific studies supporting his methodology."[38] Whether Dr. Greve's methodology is flawed—or alternatively, whether his methodology is scientifically valid—goes squarely to the reliability of Dr. Greve's proposed testimony on malingering. As explained above, the Supreme Court in *Daubert* provided several non-exclusive factors to assist courts in assessing the reliability of expert testimony.[39] The Court will now analyze whether Dr. Greve's proposed testimony is reliable, in light of the *Daubert* factors which guide the Court's decision.[40]

      1.   *Peer Review*

The Portland Digit Recognition Test, the Test of Memory Malingering, and the Word Memory Test are standardized performance validity tests not created by Dr. Greve.

---

[35] R. Doc. 346. The motion *in limine* was filed on behalf of both Plaintiffs—Raymond Howard and Calvin Howard. The argument and discussion within the motion, however, is specific to Calvin Howard and Dr. Greve's treatment of him.

[36] *See generally* R. Doc. 346; R. Doc. 663 at 40 (Transcript of *Daubert* hearing – Dr. Greve).

[37] *See* R. Doc. 346-1 at 9.

[38] *See* R. Doc. 346-1 at 7. Calvin also argues Dr. Greve's methodology is flawed, as Dr. Greve "conceded he cannot testify to [a] reasonable probability whether Plaintiff did or did not sustain a brain injury." R. Doc. 346-1 at 7.

[39] *See Daubert*, 509 U.S. at 592–96.

[40] As explained *supra*, "not every *Daubert* factor will be applicable in every situation." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004). The district court is offered broad latitude in making expert testimony determinations. *See, e.g., Kumho Tire*, 526 U.S. at 151–53.

The parties agree the tests and the questions asked pursuant to those tests are widely recognized, accepted, and applied throughout the neuropsychological community.[41] There is no dispute that these standardized tests have been subject to extensive peer review and satisfy the *Daubert* requirements with respect to expert testimony.[42]

Dr. Greve administered these performance validity tests to Calvin Howard. In so doing, Dr. Greve used certain cut-off scores and error rates to assess Calvin's performance on the tests, vis-à-vis a predetermined control group, to determine whether Calvin is malingering. Dr. Greve admittedly did not use the scores and error rates that accompany the standardized tests but, instead, used cut-off scores, error rates, and data which he and his colleagues developed over the course of their careers. Though not developed with the original tests, Dr. Greve's cut-off scores and error rates, as well as the data and statistics used in formulating those scores and error rates, are published in peer-reviewed literature.[43] Dr. Greve testified that his studies, including his cut-off scores and error rates, were published in *The Journal of Clinical and Experimental Neuropsychology* and *The Clinical Neuropsychologist* and were, as a result, subject to extensive review, commentary, and criticism prior to being published.[44] Other experts in the

---

[41] R. Doc. 663 at 36–37 (Transcript of *Daubert* hearing – Dr. Greve).

[42] *See, e.g.,* Laurence M. Binder, *The Portland Digit Recognition Test: A Review of Validation Data and Clinical Use*, 2 JOURNAL OF FORENSIC NEUROPSYCHOLOGY 27–41 (2008) ("The Portland Digit Recognition Test (PDRT) is a valid measure of motivation to perform poorly on memory tests that is useful in forensic evaluations. . . . The PDRT meets standards of the *Daubert* decision for the admissibility of scientific data into the courtroom by expert witnesses.").

[43] R. Doc. 385-11 (Greve, Bianchini, & Doane, *Classification Accuracy of the Test of Memory Malingering in Traumatic Brain Injury: Results of a Known-Groups Analysis*, 28 JOURNAL OF CLINICAL AND EXPERIMENTAL NEUROPSYCHOLOGY 1176–90 (2006)); R. Doc. 385-12 (Greve, Ord, Curtis, Bianchini, & Brennan, *Detecting Malingering in Traumatic Brain Injury and Chronic Pain: A Comparison of Three Forced-Choice Symptom Validity Tests*, 22 THE CLINICAL NEUROPSYCHOLOGIST 896–918 (2008)); R. Doc. 385-13 (Greve, Etherton, Ord, Bianchini, & Curtis, *Detecting Malingered Pain-Related Disability: Classification Accuracy of the Test of Memory Malingering*, 23 THE CLINICAL NEUROPSYCHOLOGIST 1250–71 (2009)); R. Doc. 385-25 (Greve & Bianchini, *Classification Accuracy of the Portland Digit Recognition Test in Traumatic Brain Injury: Results of a Known-Groups Analysis*, 20 THE CLINICAL NEUROPSYCHOLOGIST 816–30 (2006)).

[44] *See generally* R. Doc. 663 (Transcript of *Daubert* hearing – Dr. Greve).

neuropsychological community have attested that the journals in which Dr. Greve's articles are published are peer reviewed.[45] This factor weighs in favor of a finding that Dr. Greve's proposed testimony is reliable under *Daubert*.

### 2.  *The Known or Potential Error Rate*

The present motion *in limine* is based, in large part, on the contention that Dr. Greve destroyed "key raw data" underlying his opinion that Calvin is malingering.[46] Calvin argues Dr. Greve "destroyed and/or failed to memorialize" the cut-off scores he used to establish the tests' error rates, thereby undermining the reliability of his methodology.[47] Dr. Greve acknowledged in his deposition the importance of determining and identifying cut-off scores and error rates, as that data is vital to assessing a test's methodology.[48] Nevertheless, according to Calvin, Dr. Greve failed to memorialize this information with respect to the validity tests administered to Calvin Howard and, for that reason, his methodology is unreliable.[49] Calvin's argument is grounded on the fact that this information is not provided or discussed in Dr. Greve's expert report.[50]

The Court has reviewed Dr. Greve's original expert report and agrees that the pertinent cut-off scores and error rates are not contained in that report. Dr. Greve was, however, questioned at his deposition about error rates and cut-off scores.[51] Thereafter, Dr. Greve produced validity test tables which further explained the methodology, cut-off scores, and error rates he employed in the tests administered to Calvin Howard.[52] The

---

[45] *See infra* note 58.
[46] R. Doc. 346-1 at 12–18.
[47] R. Doc. 346-1 at 12–14.
[48] R. Doc. 346-2 at 25, 44 (Deposition of Dr. Greve); R. Doc. 346-1 at 13.
[49] R. Doc. 346-1 at 14. Plaintiffs argue: "Despite his own article and sworn deposition testimony describing the importance of the test's sensitivity, specificity and cut-off scores, Dr. Greve's expert report fails to expressly identify the Sensitivity or Specificity for the tests administered on Calvin Howard."
[50] R. Doc. 346-1 at 14.
[51] *See generally* R. Doc. 346-2 at (Deposition of Dr. Greve);
[52] R. Doc. 385-10. The Defendants represented that the Plaintiffs did not ask to re-depose Dr. Greve with respect to this additional information.

tables reference various articles written by Dr. Greve.[53] Those articles, which are published in peer-reviewed literature, contain the scores and error rates that Dr. Greve employed during his testing of Calvin.[54] As a result, Dr. Greve's cut-off scores and error rates are "easily obtained in the literature" and, for that reason, it is immaterial that the information is not contained in Dr. Greve's original expert report.[55] The Defendants note, because Dr. Greve's cut-off scores and error rates are widely published, "[a]ny neuropsychologist can review the pertinent literature and determine the specificity, error rate, and sensitivity."[56] Dr. Greve provided tables containing the cut-off scores and error rates he used in Calvin's testing after being questioned about that information in his deposition, and those tables reference peer-reviewed literature in which the scores and error rates are published. This *Daubert* factor weighs in favor of a finding that Dr. Greve's proposed testimony is reliable.

3. *Generally Accepted in Scientific Community*

In support of the methodology underlying Dr. Greve's opinions that Calvin is malingering, the Defendants submitted a number of affidavits and declarations from other neuropsychologists "attesting to their own use of Dr. Greve's published peer-reviewed literature."[57] The following neuropsychologists provided an affidavit or declaration in support of Dr. Greve's methodology: (1) Dr. Robert McCaffrey, of Albany, NY; (2) Dr. Jerry Sweet, of Chicago, IL; (3) Dr. Yossef Ben-Porath, of Copley, OH; (4) Dr. Kyle Boone, of Torrance, CA; (5) Dr. Glenn Larrabee, of Sarasota, FL; (6) Dr. Stuart Anderson, of Haywards Heath, West Sussex, UK; (7) Dr. Michael Chafetz, of New Orleans,

---

[53] *See generally* R. Doc. 385-10.
[54] R. Doc. 377 at 15–16.
[55] R. Doc. 377 at 16. *See also In re Actos (Pioglitazone) Products Liability Litigation*, 2014 WL 46818, at *5.
[56] *See* R. Doc. 377 at 15–16.
[57] R. Doc. 448 at 3.

LA; (8) Dr. Jacobus Donders, of Grand Rapids, MI; (9) Dr. Manfred Greiffenstein, of Royal Oak, MI; (10) Dr. Robert Heilbronner, of Chicago, IL; (11) Dr. Scott Millis, of Detroit, MI; (12) Dr. Laurence Binder, of Beaverton, OR; (13) Dr. Corwin Boake, of Houston, TX; (14) Dr. Edward Peck, of Richmond, VA; (15) Dr. Alan Moss, of Sutton Coldfield, West Midlands, UK; (16) Dr. Joel Morgan, of Morris Town, NJ; (17) Dr. Robert Denney, of Springfield, MO; (18) Dr. David Bush, of Palm Beach Gardens, FL; (19) Dr. Elizabeth Glen, of Jacksonville, FL; (20) Dr. Nancy Hebben, of Newton, MA; (21) Dr. David Hartman, of Chicago, IL; (22) Dr. Robin Heinrichs, of Wichita, KS; (23) Dr. Thomas Staats, of Shreveport, LA; and (24) Dr. Kevin Bianchini, of Metairie, LA.[58]

Having considered these affidavits and declarations, the Court finds Dr. Greve's methodology is generally accepted in the scientific community.[59] It is apparent that leading neuropsychologists from around the country—and beyond—rely on Dr. Greve's articles and publications, as well as the methodology which Dr. Greve employs when conducting neuropsychological validity testing. This *Daubert* factor weighs in favor of a finding that Dr. Greve's proposed testimony is reliable.

C.   FEDERAL RULES OF EVIDENCE 402 & 403

Alternatively, Calvin argues the Court should exclude Dr. Greve's testimony with respect to malingering under Federal Rules of Evidence 402 and 403.[60] Calvin contends Dr. Greve's proposed malingering testimony (1) invades the province of the jury in making credibility determinations; and (2) is irrelevant, amounts to impermissible character

---

[58] R. Docs. 448-3, 448-4, 448-5, 448-6, 448-7, 448-8, 448-9, 448-10, 448-11, 448-12, 448-13, 448-14, 448-15, 448-16, 448-17, 448-18, 448-19, 448-20, 448-21, 448-22, 448-23, 448-24, 448-25, 448-26.
[59] *See, e.g., Babin v. Prime Energy Sys.*, No. 00-575-C-M3, 2002 WL 34367716, at *1–2 (M.D. La. Sept. 27, 2002) (relying on supporting affidavit as evidence that certain methodology was generally accepted in scientific community).
[60] R. Doc. 346-1 at 19–22.

evidence, and has a probative value which is substantially outweighed by the danger of unfair prejudice.[61]

First, the Court acknowledges that several other courts in this district have allowed experts to testify with respect to malingering and whether a certain individual was, or was not, malingering.[62] This Court likewise finds that such testimony on malingering from Dr. Greve will not invade the province of the jury but would be helpful in making factual determinations with respect to Calvin's past, present, and future medical condition. The Court notes, moreover, that many of Plaintiffs' witnesses, including several expert witnesses, have testified at trial that Raymond and Calvin are *not* malingering. Second, and for similar reasons, the Court finds Dr. Greve's proposed malingering testimony is not irrelevant, and the testimony does not constitute impermissible character evidence. Dr. Greve's testimony with respect to malingering is a clinical impression based on the results of various tests Dr. Greve administered. The testimony is pertinent to Calvin's medical condition, not whether Calvin has a certain character trait. Furthermore, the Court finds the probative value of such testimony is not outweighed by the danger of unfair prejudice.

For the foregoing reasons, the motion *in limine*, insofar as it pertains to Dr. Greve's proposed testimony with respect to Calvin Howard, is **DENIED**.

## II.   RAYMOND HOWARD

This motion *in limine* is filed on behalf of both Plaintiffs, Calvin Howard and Raymond Howard.[63] The motion and the arguments set forth therein are, however,

---

[61] R. Doc. 346-1 at 19–22.
[62] *Bonds v. Padlock*, No. 06-7830, 2008 WL 4889794 (E.D. La. Nov. 10, 2008); *Guilbeau v. W.W. Henry Co.*, 85 F.3d 1149 (5th Cir. 1996); *Tate v. Zapata Gulf Marine Corp.*, No. 93-5, 1993 WL 379561 (E.D. La. Sept. 13, 1993); *Araujo v. Treasure Chest Casino, LLC*, No. 97-3043, 1999 WL 219771 (E.D. La. Apr. 14, 1999)).
[63] *See* R. Doc. 346-1 at 8.

specific to Calvin Howard and Dr. Greve's treatment of Calvin.[64] The motion does not address Dr. Greve's treatment of Raymond Howard or Dr. Greve's expert report with respect to Raymond. At the *Daubert* hearing, counsel for Raymond Howard conceded the motion does not address Raymond's injuries, Dr. Greve's treatment of Raymond, or Raymond's scores on the tests administered by Dr. Greve. But counsel noted that Raymond's objections to Dr. Greve's proposed testimony concern, generally, the methodology employed by Dr. Greve in concluding that Raymond is malingering, whether malingering is even a valid diagnosis, and Dr. Greve's alleged failure to provide his cut-off scores. For the reasons stated above with respect to Calvin Howard, the motion *in limine* insofar as it pertains to Raymond is **DENIED**.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Plaintiffs' motion *in limine*[65] to exclude the proposed testimony of Dr. Kevin Greve be and hereby is **DENIED**.

**New Orleans, Louisiana, this 11th day of February, 2016.**

*Susie Morgan*

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[64] *See generally* R. Doc. 346-1.
[65] R. Doc. 346.