# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CALVIN HOWARD, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 13-4811**<br>**c/w 13-6407 and 14-1188** |
| **OFFSHORE LIFTBOATS, LLC,**<br>**ET AL.** | **SECTION "E" (5)** |

## ORDER AND REASONS

This matter is before the Court *sua sponte* for the imposition of sanctions against Ryan Zehl, lead trial attorney for Plaintiff Calvin Howard. The Court has disciplinary jurisdiction over Mr. Zehl, who was admitted pro hac vice and enrolled as counsel of record in this case, pursuant to Local Rule 83.2.5.[1] The Court, on two occasions, ordered Mr. Zehl to show cause as to why he should not be sanctioned for his conduct during the trial of this matter.[2] The Court held two show-cause hearings, one during the trial and one after its conclusion. The Court hereby imposes monetary sanctions against Mr. Zehl pursuant to the Court's inherent authority.

## BACKGROUND & CASE HISTORY

The matter of *Calvin Howard, et al. v. Offshore Liftboats, LLC, et al.* proceeded to a jury trial on January 25, 2016. The trial involved the claims of Plaintiffs Calvin Howard and Raymond Howard against Offshore Liftboats, LLC ("OLB"); K&K Offshore, LLC ("K&K"); and the insurers of both entities.[3] The claims asserted by the Plaintiffs were for various personal injuries, including alleged traumatic brain injuries, which the Plaintiffs

---

[1] Local Rule 83.2.5 provides: "When an attorney applies to be admitted or is admitted to this court for purposes of a particular proceeding (pro hac vice), the attorney is deemed thereby to have conferred disciplinary jurisdiction upon this court for any alleged misconduct of that attorney arising in the course of or in preparation for the proceeding."
[2] R. Docs. 816, 832.
[3] R. Doc. 757 at 6–7 (Pretrial Order).

1

claim they sustained during a failed personnel-basket transfer in the offshore waters of the Gulf of Mexico on May 16, 2013.[4] The trial lasted approximately four (4) weeks, concluding on February 19, 2016, when the jury returned its verdict.[5] The jury found OLB to be 20% at fault for the accident and K&K to be 80% at fault.[6] K&K settled with the Plaintiffs after trial commenced but prior to the submission of the case to the jury for decision.

At the time of the incident-in-question, the Plaintiffs were employed by OLB and were in the process of being transported from a K&K vessel, the M/V Contender, to an OLB vessel, the L/B Janie, to begin their shifts.[7] The Janie was, at the time, situated approximately 30 miles off the Louisiana and Texas coasts in the Gulf of Mexico.[8] The personnel basket was lowered by the Janie's onboard crane to the deck of the Contender, and the Plaintiffs boarded the basket shortly thereafter.[9] As OLB's crane operator lifted the basket, it became lodged on one of the Contender's rear jump-deck railings.[10] Plaintiffs then fell from the basket to the deck of the Contender,[11] and, according to the Plaintiffs, they suffered a variety of severe injuries for which they sought recovery in this action.[12] The cause of the incident, including why the basket became lodged on the Contender's rear-jump deck railing, as well as the extent of the Plaintiffs' alleged injuries and the resulting damages to which they were entitled, were issues of much dispute at trial.

---

[4] *See generally* R. Doc. 757 at 5–8, 15–22 (Pretrial Order).
[5] R. Doc. 827.
[6] R. Doc. 829 (Jury Verdict).
[7] R. Doc. 757 at 6–7, 15–16, 20–21 (Pretrial Order).
[8] R. Doc. 757 at 7, 15–16, 20–21 (Pretrial Order). *See also* R. Doc. 819 at 8.
[9] R. Doc. 757 at 7, 17, 21 (Pretrial Order).
[10] R. Doc. 757 at 8, 18, 21–22 (Pretrial Order).
[11] R. Doc. 757 at 8, 18, 22 (Pretrial Order).
[12] R. Doc. 757 at 8–14, 19–20, 22 (Pretrial Order).

**ORDERS TO SHOW CAUSE**

Mr. Zehl was twice ordered to show cause as to why he should not be sanctioned for his conduct during the trial of this matter. The Court will address Mr. Zehl's conduct leading to each order to show cause separately.

I.     FIRST ORDER TO SHOW CAUSE—ZEHL'S CONDUCT DURING THE TRIAL

For contextual purposes, the Court first notes that this litigation was hotly contested and has been fraught with conflict since its earliest stages. The tension between opposing counsel in this case was palpable during status conferences, hearings, and depositions. In fact, in an Order and Reasons dated March 4, 2015, Mr. Zehl and a member of the defense team both were sanctioned by Magistrate Judge Michael North for unprofessional conduct during the deposition of a fact witness in this case.[13] With this in mind, and to ensure that professionalism and decorum were maintained, the Court made it clear prior to trial, as well as on the record during the trial's initial stages, that all counsel were expected to act professionally and in a courteous manner with one another and to comply with the Court's prior rulings regarding the admissibility of evidence.[14]

The Court's admonitions apparently did not register with Mr. Zehl. The first week of trial saw Mr. Zehl display, for example, an unprofessional attitude in his interactions with the Court, defense counsel, and various witnesses. The Court was forced to admonish Mr. Zehl for arguing objections in front of the jury; arguing with opposing counsel, instead of speaking to the Court, when objections were lodged; and reacting to witnesses' testimony and the Court's rulings in an inappropriate manner in the presence of the jury. The second week of trial was no different. The Court was, for example, forced to admonish

---

[13] *See generally* R. Doc. 193.
[14] *See, e.g.,* R. Doc. 819 at 108–11.

Mr. Zehl for making gratuitous comments on the credibility of witnesses, as opposed to asking questions. On more than one occasion, Mr. Zehl even challenged the Court's rulings with which Mr. Zehl apparently did not agree. The Court found the latter to be particularly troubling and repeatedly admonished Mr. Zehl, hopeful he would recognize the impropriety of his behavior and begin conducting himself in a professional manner.

Mr. Zehl's improper behavior nevertheless continued. On February 11, 2016, Mr. Zehl called Thomas Halverson as a witness on cross-examination.[15] Mr. Halverson served as the maintenance-and-cure claim representative for OLB and OLB's insurer in connection with this incident.[16] While vigorous cross-examination is to be expected, Mr. Zehl crossed the line. The Court sustained defense objections to Mr. Zehl's questioning. Apparently dissatisfied with the Court's ruling on a particular defense objection, Mr. Zehl remarked to the Court during a sidebar: "Should I just – I might as well just let the witness off the stand."[17] This statement, when viewed in context,[18] clearly conveyed Mr. Zehl's opinion that the Court lacked impartiality and was improperly preventing the Plaintiffs from presenting their case. After this statement, the Court again admonished Mr. Zehl for his repeated unprofessional conduct, reminding him of his obligation to be respectful to the Court.[19]

Later that same day, Mr. Zehl once again exhibited behavior which the Court found to be particularly egregious.[20] During the testimony of Dr. Everett Robert, a defense expert, Mr. Zehl yet again questioned the impartiality of the Court.[21] During a sidebar

---

[15] *See* R. Doc. 836 at 82.
[16] *See, e.g.,* R. Doc. 836 at 83.
[17] R. Doc. 836 at 122.
[18] *See* R. Doc. 836 at 120–22.
[19] R. Doc. 836 at 122.
[20] *See* R. Doc. 836 at 278–81.
[21] *See* R. Doc. 836 at 278–81.

4

conference, in response to a ruling Mr. Zehl stated to the Court: "You couldn't make this more difficult for us."[22] Once the jury was excused at the end of that day, the Court again admonished Mr. Zehl, explaining that this would be his final warning.[23]

Mr. Zehl, however, still did not heed the Court's admonition. On February 12, 2016, Mr. Zehl began his cross-examination of Dr. Christopher Cenac, the OLB medical expert, not by asking him a question but by commenting on Dr. Cenac's credibility by saying, in the presence of the jury, "You're infamous."[24] Moments later Mr. Zehl criticized Dr. Cenac for testifying as an expert witness on behalf of defendants in personal-injury matters and for, in this case, reaching the conclusion that Mr. Zehl's client was "malingering."[25] Mr. Zehl again commented on Dr. Cenac's credibility rather than posing questions to the doctor to show his alleged bias, first saying: "So, you just come into court and call people liars, but you don't keep track of how much money you're making."[26] Even after the Court sustained an objection to this question, Mr. Zehl continued, saying: "Doctor, why don't you look at Calvin, please, and tell him he's a liar?"[27] This statement predictably drew the ire of defense counsel, eliciting an objection which was sustained by the Court.[28] It was after this exchange with Dr. Cenac that the Court informed Mr. Zehl she would hold a show-cause hearing where he would have the opportunity to explain why he should not be sanctioned for his continued unprofessional and improper conduct during trial.[29]

---

[22] R. Doc. 836 at 279–80.
[23] R. Doc. 836 at 351–53.
[24] R. Doc. 837 at 277.
[25] R. Doc. 837 at 277–79.
[26] R. Doc. 837 at 278.
[27] R. Doc. 837 at 278–79.
[28] R. Doc. 837 at 279.
[29] *See* R. Doc. 816 (Court's Order setting the hearing on the rule to show cause).

The show-cause hearing was held on February 15, 2016.[30] The Court, both prior to and during the hearing, informed Mr. Zehl of his conduct leading to the hearing. Without recounting every instance, the Court did explain to Mr. Zehl the conduct found to be objectionable:

> In general, throughout the trial you have argued with me after my rulings which the record will reflect. What the record won't reflect is your demeanor, both your body language and your tone of voice, by turn visually angry and grippingly sarcastic. I've even see you roll your eyes after rulings of the Court. You have gone so far as to question my impartiality. At a bench conference – and I'm paraphrasing – you said something like "Could you make it any harder on us?" The only way I can interpret that is that you do not believe that I'm being impartial. Last week I warned you that further inappropriate behavior would result in your being sanctioned. Nevertheless, on Friday you persisted in behaving inappropriately specifically when examining Dr. Cenac.
>
> Rather than cross-examining Dr. Cenac regarding his prior representation of defendants to attempt to show his bias and prejudice which, of course, would have been your right, you gratuitously commented on his veracity by saying to Dr. Cenac, "You are infamous." It was obvious to me that you knew this was an inappropriate comment and that you were quite pleased with yourself with putting it in front of the jury.
>
> Shortly thereafter during Dr. Cenac's testimony, you again commented on his testimony rather than asking him questions, which is what you're supposed to do. You're supposed to ask questions, not make comments. When Dr. Cenac said he didn't know what he was getting paid for his testimony, you said, "You just come into court and call people liars." . . . You then said, "Doctor, why don't you look at Calvin, please, and tell him he's a liar." Now, you could have – there are many ways that you could have questioned Dr. Cenac and they would have been perfectly legitimate and appropriate, but that is not the way to do it.[31]

Mr. Zehl was represented by counsel at the hearing. Through counsel, and briefly on his own behalf, Mr. Zehl attempted to justify his actions and his behavior.[32] Specifically with respect to his cross-examination of Dr. Cenac, Mr. Zehl explained that he was under

---

[30] *See* R. Docs. 816, 856 at 8–21.
[31] R. Doc. 856 at 9–11.
[32] R. Doc. 856 at 11–21.

6

the impression Dr. Cenac "talked about [how] he was famous" in his deposition, thereby opening the door for Mr. Zehl to call him "infamous" on cross-examination at trial.[33] Mr. Zehl also explained that, in asking Dr. Cenac to look at Calvin and "tell him he's a liar," he felt he had done nothing wrong and did not think the statement was inappropriate.[34] Exercising his propensity toward sarcasm, Mr. Zehl then asked the Court to "enlighten" him as to how he should proceed, in the future, if a witness takes the stand and calls his client a liar.[35] Mr. Zehl unhelpfully cited two United States Supreme Court decisions addressing *criminal* sanctions and the circumstances in which such sanctions should be imposed,[36] but those decisions had no relevance to whether Mr. Zehl should be sanctioned civilly for his conduct in this case. Mr. Zehl ultimately apologized for his conduct and assured the Court that his behavior would improve. Despite its reservations, the Court deferred a decision on imposing sanctions. There was an improvement in Mr. Zehl's demeanor, but troubled waters lay ahead.

II. SECOND ORDER TO SHOW CAUSE—ZEHL'S CONDUCT DURING CLOSING ARGUMENT

Prior to closing argument, the Court gave an explicit, preemptive warning to counsel as to the parameters of closing argument and the behavior expected of the attorneys giving closing argument on behalf of their clients. In fact, the day prior to closing argument, the Court, fearful that attorney behavior might be an issue, specifically warned the parties to be on their best behavior and to avoid doing anything improper, or the Court would be forced to take action.[37] Mr. Zehl was not present for this discussion,

---

[33] *See* R. Doc. 856 at 16.
[34] R. Doc. 856 at 17–18.
[35] R. Doc. 856 at 18.
[36] *Sacher v. United States*, 343 U.S. 1 (1952); *In re McConnell*, 370 U.S. 230 (2004).
[37] R. Doc. 860 at 4–5.

7

but the Court instructed his co-counsel to relay the message to Mr. Zehl.[38] Mr. Zehl elected to give the closing argument for his client, Calvin Howard.[39] It is plain from Mr. Zehl's closing argument that the Court's message was not heeded. The Court will now specifically address the objectionable conduct exhibited by Mr. Zehl during closing argument.

1. Trust Account

Mr. Zehl misrepresented to the jury during his closing argument that any money awarded to Calvin would be placed into a trust account. Mr. Zehl first said, "Calvin is going to live with what the seven of you do for the rest of his life. There are no second chances if he gets worse, if that money that's put into a trust to pay for Touchstone isn't enough, if medical costs go up, if he gets bad, if his back gets worse."[40] Later, Mr. Zehl said awarding Calvin "whatever it comes out to – the $400,000 to have a trustee or whatever every year – that's how you ensure that he's not getting any money in his pocket."[41] Finally, Mr. Zehl, in discussing Calvin's future medical expenses, stated that the figure totaled $12,040,838 and said: "This is a lot of money, yes. It's for medical treatment. It's going to go into a trust to make sure that he is okay, that he doesn't get worse, that tomorrow gives him a chance of being at least as good as he is today."[42]

After the conclusion of Mr. Zehl's argument, defense counsel objected, out of the presence of the jury, to Mr. Zehl's statements that the funds awarded to Calvin would be placed into a trust and requested that the Court instruct the jury that there was no legal requirement that any funds awarded be placed into trust.[43] According to Mr. Zehl, his

---

[38] R. Doc. 860 at 4.
[39] R. Doc. 833 at 33.
[40] R. Doc. 833 at 37.
[41] R. Doc. 833 at 43.
[42] R. Doc. 833 at 60.
[43] R. Doc. 833 at 63.

statements about the funds going into a trust were conclusions drawn from Dr. Gorman's testimony.[44] The Court finds this reasoning unpersuasive. Dr. Gorman did not and could not testify that there was any legal requirement that any funds awarded be placed in trust. Dr. Gorman merely noted, while discussing the "financial management" category in Calvin's life-care plan, that it was possible the funds *could* be placed in trust or otherwise managed by a third party. Dr. Gorman stated:

> Financial management means that if a fund of money is set aside, particularly for medical care, it needs to go to medical care. It needs to be absolutely protected so it lasts for the duration of that person's life and so it's exhausted when that person dies. It will have been there sufficiently. . . . [S]ometimes it's a trust, sometimes it's an annuity. But it basically means that the money is going to go where it needs to go.[45]

Dr. Gorman confirmed that "one of the purposes of this is to make sure that any funds set aside for medical care [are] actually used for medical care."[46] Dr. Gorman was then asked: "So, how long do you *recommend* this financial management for Calvin?"[47] Dr. Gorman responded: "Until he expires."[48] Dr. Gorman merely recommended that Calvin obtain financial management services and possibly place his award, if any, in trust, decisions which ultimately were and are Calvin's to make.

The Court agreed with defense counsel that there was no legal requirement the funds be placed into a trust and, without objection from Plaintiffs' counsel,[49] gave the requested instruction, saying: "Ladies and gentlemen, I have one thing I'd like to clarify for you. During his closing argument, Mr. Zehl stated that a portion of the funds awarded would be put into a trust fund. I want to let you know that there is no legal requirement

---

[44] *See* R. Doc. 844 at 8.
[45] R. Doc. 838 at 50–51.
[46] R. Doc. 838 at 51.
[47] R. Doc. 838 at 51 (emphasis added).
[48] R. Doc. 838 at 51.
[49] R. Doc. 833 at 63–69.

9

that amounts awarded, if any, be placed into a trust."[50] The Court, out of the presence of the jury, also specifically instructed Mr. Zehl not to mention the trust issue again. The Court explained to Mr. Zehl that, "obviously, there's nothing that forces the money to go into a trust and . . . you . . . mentioned the trust and we don't know whether that money is being put in a trust or not. That's the truth. And I don't think you should have said that. Don't mention it again when you come back up here."[51] Nevertheless, Mr. Zehl returned to the issue in his rebuttal, saying, "[A]nd about the trust. If there was ever any suggestion that I meant that that was a mandatory thing, no. Dr. Gorman talked about it, and he has to set it up with my help. And that's how we make sure that Calvin gets to pay for his medical care in the future."[52]

The Court notes that counsel for OLB did address the issue of whether the money would be placed in trust in his closing argument, prior to Mr. Zehl's rebuttal, echoing the Court's instruction that there was no requirement that Calvin place the funds into a trust. Mr. Zehl cited this as the reason for his raising the issue again on rebuttal, noting it was "necessary to respond to statements from Offshore Liftboats' counsel."[53] This argument falls on deaf ears considering the Court had clearly and specifically instructed Mr. Zehl not to mention the issue again and nothing in the defense closing argument justified Mr. Zehl's disobeying the Court's order.

2. Exhibit 150

On the day prior to closing argument, defense counsel raised an issue with the Court with respect to Mr. Zehl's request to use exhibits during his closing argument that

---

[50] R. Doc. 833 at 69.
[51] R. Doc. 833 at 63.
[52] R. Doc. 833 at 123.
[53] *See* R. Doc. 844 at 8.

had not been admitted into evidence.[54] The Court specifically reminded all counsel that only exhibits admitted into evidence could be used. The Court's instruction restated the obvious rule that closing argument is intended only to be a summary of the evidence introduced and admitted at trial.[55] Mr. Zehl was absent from this discussion, though his co-counsel vowed to relay the Court's message to him.[56] Despite this specific instruction and the well-known rule upon which the instruction was based, Mr. Zehl used an exhibit, Exhibit 150, which had not been admitted into evidence during his closing argument. Referring to the post-incident statement given by Tim Lawrence to the Coast Guard, Mr. Zehl stated: "So first, we have Tim Lawrence's statement – this is in evidence – Exhibit 150."[57] There could be no confusion that this particular exhibit was not admitted into evidence at trial, as the exhibit had been objected to before trial,[58] and the exhibit was specifically ruled inadmissible by the Court.[59] Moreover, upon the conclusion of the presentation of evidence, counsel for all parties signed a certification of trial exhibits attesting to the fact that counsel had reviewed the exhibits in evidence and certified that those exhibits alone constituted the universe of exhibits which had been admitted into evidence.[60] The Court's staff even painstakingly reviewed the list of admitted exhibits with Mr. Zehl's staff prior to closing argument so that there could be no question as to what

---

[54] R. Doc. 860 at 216.
[55] *See, e.g., Parker v. Cain*, 445 F. Supp. 2d 685, 705 (E.D. La. 2006); *Malone v. Stephens*, No. 4:13-CV-718-O, 2015 WL 408045, at *11 (N.D. Tex. Jan. 30, 2015); *Ruiz v. Scotland Yard*, No. 08-3862, 2010 WL 1817242, at *3 (E.D. Pa. Apr. 29, 2010); *Tagatz v. Marquette Univ.*, 681 F. Supp. 1344, 1351 (E.D. Wis. 1988). Moreover, the Fifth Circuit has held that it is "[a] particularly indefensible tactic to use closing arguments to bring before the jury damaging facts not in evidence and never established." *Lockamy v. Carrillo*, 432 F. App'x 283, 286 (5th Cir. 2011) (quoting *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 284 (5th Cir. 1975)) (internal quotations omitted).
[56] R. Doc. 860 at 216–17.
[57] R. Doc. 833 at 53.
[58] R. Doc. 600 at 6; R. Doc. 601 at 12.
[59] *See* R. Doc. 814 at 1; R. Doc. 836 at 28–30, 74.
[60] R. Doc. 830. Mr. Zehl did not sign the certification of trial exhibits, but his co-counsel did. *Id.*

11

had been admitted. Nevertheless, Mr. Zehl argued his use of Exhibit 150 during closing argument was "inadvertent" and a "minor error done in good faith," as he truly believed Exhibit 150 had been admitted into evidence.[61] Given the steps the Court took to remind all counsel that only admitted exhibits could be used during closing argument, as well as the certification of trial exhibits signed by counsel for each party, the Court finds Mr. Zehl's argument unconvincing. The Court finds that Mr. Zehl knew the exhibit had not been admitted into evidence and could not be used during closing argument.

    3. <u>Disclosure of Videotaped Deposition Testimony</u>

The Court required counsel for Plaintiffs to disclose to defense counsel, prior to closing argument, the portions of videotaped depositions played at trial that counsel intended to use during closing argument.[62] Mr. Zehl used several excerpts of deposition testimony but failed to disclose one of them, an excerpt of Captain James Godwin's deposition testimony, to defense counsel. During closing argument, Mr. Zehl previewed Captain Godwin's deposition testimony prior to playing a videotaped excerpt, stating: "This is important, guys. This is all about the sequence of events. The CONTENDER moved, but you have to pay attention to when. Here it says the basket unhooked and then the boat took off. That is correct. That is what the evidence is and that's what it's been all along. And Captain Godwin – you're about to hear exactly what happened." Mr. Zehl then proceeded to play the undisclosed videotaped excerpt of Captain Godwin's deposition, the transcript of which read as follows:

> Q.     And what happened after Calvin and Raymond hit the deck of the Contender?
>
> A.     I told the captain or whoever answered the radio on the liftboat I was pulling out because I needed to get down – I couldn't leave the

---

[61] R. Doc. 844 at 9.
[62] R. Doc. 860 at 119–120.

> controls of the vessel. So I told them I was pulling out to check on them.
>
> Q. Pulling out in which direction, away from the Janie?
>
> A. Yes, away from the Janie, where I could let the boat drift.[63]

According to Mr. Zehl, his failure to disclose this deposition excerpt was an "inadvertent error" and was not done in bad faith.[64] Mr. Zehl represented that his co-counsel, Eric Allen, was tasked with selecting, for closing argument, page and line designations from the deposition testimony played at trial, but "inadvertently failed to include an additional page and line designation from Mr. Godwin's deposition . . . which made it into the PowerPoint used in closing."[65] Mr. Zehl contends this was an "inadvertent mistake, not a conscious decision to withhold or hide Plaintiff's intent to use the clip."[66] Though Mr. Zehl argued OLB was not prejudiced by this "mistake," the Court disagrees and notes that defense counsel, had they known Mr. Zehl intended to play the clip, might have opted to play an alternative deposition clip in response. Defense counsel was not able to make such a decision, as they were unaware that the clip from Mr. Godwin's deposition would be played. At the end of the day, Mr. Zehl was the lead attorney for Calvin Howard, and the responsibility for this "error" falls on his shoulders.

    4. <u>Objections Lodged by Defense Counsel</u>

Mr. Zehl on rebuttal, after the defense's closing argument, commented on the number of objections made by defense counsel throughout the trial. Specifically, Mr. Zehl stated: "I don't know what else I can tell you. At the end of the day, it's up to you guys. If you think that Calvin and my firm have not been truthful – I've tried to show you

---

[63] R. Doc. 788 at 24.
[64] R. Doc. 844 at 10–11.
[65] R. Doc. 844 at 11.
[66] R. Doc. 844 at 11.

everything I possibly could. If you remember, we got lots of objections."[67] It is well accepted that the objections made by the attorneys throughout the trial are not evidence and should not be considered by the jury.[68] In fact, the Court instructed the jury, prior to their deliberating, that objections made by attorneys during trial are not evidence and that the jury should disregard them. The specific charge the Court read to the jury was as follows:

> During the course of the trial, you have heard objections to the evidence. Sometimes these have been argued out of the hearing of the jury. It is the duty of the attorney on each side of a case to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible. You should not draw any inference against or show any prejudice against a lawyer or his client because of the making of an objection. Upon allowing testimony or other evidence to be introduced over the objections of an attorney, the Court does not, unless expressly stated, indicate any opinion as to the weight or effect of such evidence. As stated before, you the jury are the sole judges of the credibility of all witnesses and the weight and effect of all evidence. When the Court has sustained an objection to a question addressed to a witness, the jury must disregard the question entirely, and may draw no inference from the wording of it, or speculate as to what the witness would have said if permitted to answer.[69]

According to Mr. Zehl and his counsel, Mr. Zehl's commentary on the number of objections made by defense counsel during trial "was made in response to objectionable statements Offshore Liftboats' counsel made in closing argument to attack the credibility of witnesses and Plaintiff's counsel."[70] However, after the defense's closing but prior to his rebuttal, Mr. Zehl did not object to any of defense counsel's statements or seek clarification from the Court as to whether he could mention objections lodged by the defendants during trial. Instead, Mr. Zehl apparently chose to address what he perceived as objectionable statements of defense counsel by making objectionable statements of his

---

[67] R. Doc. 833 at 128.
[68] *See, e.g., United States v. Granadeno*, 605 F. App'x 298, 302 (5th Cir. 2015) (citations omitted).
[69] R. Doc. 831 at 6–7.
[70] R. Doc. 844 at 12–13.

14

own. The day after closing arguments, Mr. Zehl's co-counsel stated for the record Calvin's objections to the defense closing argument. At that time Mr. Zehl's co-counsel, Bobby Delise, objected to comments made by defense counsel during closing argument on the credibility of certain witnesses and Plaintiffs' counsel.[71] The Court notes, however, that counsel for OLB violated no rules by arguing that the testimony offered by the Plaintiffs lacked credibility.

Mr. Zehl again argues his statement regarding defense objections during trial was not made in "bad faith," nor did he intend to disrespect the Court, but instead "wanted to stress that he and his client had nothing to hide."[72] Mr. Zehl concluded that the "utterance was a judgment call made in the heat of closing argument of a four-week trial" and "does not rise to the level of sanctionable conduct."[73] Mr. Zehl's argument would have been more convincing had this been his only instance of questionable conduct during the trial.

5. The Second Show-Cause Hearing

The Court held a show-cause hearing on March 24, 2016, to address Mr. Zehl's behavior during closing argument.[74] In the order setting the show-cause hearing, the Court specifically delineated the conduct exhibited by Mr. Zehl during closing argument which caused the Court concern.[75] Mr. Zehl engaged in conduct during closing argument that included:

1. Improperly stating that any funds awarded would be placed in a trust account to be used solely for Calvin Howard's future medical treatment;

2. Using Exhibit 150 which had not been admitted into evidence;

---

[71] R. Doc. 862 at 8–11.
[72] R. Doc. 844 at 13.
[73] R. Doc. 844 at 13.
[74] *See* R. Doc. 832.
[75] *See* R. Doc. 832.

15

3. Failing to comply with the Court's directive that Plaintiffs' counsel disclose to defense counsel, prior to closing argument, the portions of videotaped depositions which were played at trial and which Mr. Zehl planned to show the jury during closing argument; and

4. Commenting on objections lodged by defense counsel during the trial and implying that those objections prevented him from putting certain evidence before the jury.[76]

Mr. Zehl filed a detailed memorandum in response to the Court's show-cause order on March 18, 2016.[77] In the memorandum and in person during the show-cause hearing, Mr. Zehl, through counsel and on behalf of himself, addressed each of the Court's concerns with respect to his closing argument. A detailed recitation of Mr. Zehl's arguments is not needed for present purposes, though it suffices to say that Mr. Zehl attributed each of his missteps during closing argument to inadvertence.[78] Mr. Zehl argued to the Court that his closing argument was not delivered in bad faith, nor did he intend to ignore the Court's warnings, but that the improper conduct which he exhibited was unintentional, inadvertent, and simply "a mistake."[79]

## LAW AND ANALYSIS

In *Chambers v. Nasco, Inc.*, the United States Supreme Court held that federal district courts have the inherent power to sanction attorneys for their conduct during trial.[80] This inherent sanctioning power, according to *Chambers*, provides district courts with the necessary power to control the litigation before them. The Supreme Court noted in *Chambers*, however, that district courts should exercise this inherent power to sanction with "restraint" and "discretion,"[81] and the Fifth Circuit has interpreted *Chambers* as

---

[76] *See* R. Doc. 832.
[77] R. Doc. 844.
[78] *See generally* R. Doc. 844.
[79] *See generally* R. Doc. 865.
[80] *Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991).
[81] *Id.* at 44.

16

requiring district courts to find, before imposing sanctions, that the attorney subject to sanctioning engaged in "bad-faith conduct."[82] District courts need not make a specific finding of bad faith in every case in which sanctions may be warranted.[83] For example, in *Sandifer v. Gusman*, the Fifth Circuit held that, for purposes of imposing sanctions, bad faith can be inferred when it is patent from the record, obviating the need for the court to make specific findings of bad faith.[84]

Before invoking its inherent power to sanction, the district court must comply with the mandates of due process. The Fifth Circuit in *Meyers v. Textron Financial Corp.* reaffirmed the general principle that "due process demands only that the sanctioned party be afforded notice and an opportunity to be heard."[85] In this case, the Court repeatedly warned Mr. Zehl about his conduct and held two show-cause hearings, one to address Mr. Zehl's conduct during the trial and the other to address his conduct during closing argument. In connection with those hearings, the Court specifically outlined instances where Mr. Zehl's conduct was inappropriate and unprofessional, and the Court gave Mr. Zehl an opportunity to justify his behavior to the Court. Also, the Court notes that Mr. Zehl was represented by counsel at both hearings. Because the Court gave Mr. Zehl notice and an opportunity to be heard in two show-cause hearings, the Court finds that due process has been satisfied.

Sanctions against Mr. Zehl are warranted. By virtue of his admission pro hac vice to practice in the Eastern District of Louisiana and serve as counsel of record in this case,

---

[82] *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 591 (5th Cir. 2008) (quoting *CJC Holdings, Inc. v. Wright & Lato*, 989 F.3d 791, 794 (5th Cir. 1993)). *See also Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995); *Resolution Trust Corp. v. Bright*, 6 F.3d 336, 340 (5th Cir. 1993); *In re Thalheim*, 853 F.2d 383, 389 (5th Cir. 1988).
[83] *See, e.g., Blanco River, LLC v. Green*, 457 F. App'x 431, 438 (5th Cir. 2012) (citations omitted).
[84] *Sandifer v. Gusman*, No. 15-30308, 2015 WL 9287200, at *3 (5th Cir. Dec. 21, 2015) (not yet released for publication).
[85] *Meyers v. Textron Financial Corp.*, 609 F. App'x 775, 778 (5th Cir. 2015).

Mr. Zehl vested the Court with disciplinary jurisdiction over his conduct, pursuant to Local Rule 83.2.5.[86] The Eastern District has adopted as its own the Louisiana Rules of Professional Conduct and the Louisiana State Bar Association Code of Professionalism.[87] Mr. Zehl, through his conduct during the trial of this matter and during closing argument, violated a number of these rules. Rule 8.2 of the Louisiana Rules of Professional Conduct states: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office." As described herein, Mr. Zehl questioned the Court's integrity on more than one occasion, making comments to the Court that were clearly intended to imply that she was intentionally and improperly preventing Mr. Zehl from effectively presenting his case to the jury. These comments were attacks on the Court's integrity in violation of Rule 8.2 of the Louisiana Rules of Professional Conduct. Furthermore, the Louisiana State Bar Association Code of Professionalism provides, in part, that a lawyer must conduct himself or herself "with dignity, civility, courtesy and a sense of fair play." Rule 3.5 of the Louisiana Rules of Professional Conduct provides, *inter alia*, that a "lawyer shall not . . . engage in conduct intended to disrupt a tribunal." Throughout these proceedings, Mr. Zehl failed to display a sense of civility in his interactions. Mr. Zehl was discourteous to the Court, opposing counsel, and numerous defense witnesses. Mr. Zehl's behavior violated the Louisiana State Bar Association Code of Professionalism and Rule 8.2 of the Louisiana Rules of Professional Conduct.

---

[86] *See supra* note 1.
[87] LR 83.2.3. *See also* LA. STATE BAR ASSOC. CODE OF PROFESSIONALISM (as adopted by the Judges of the Eastern District of Louisiana on August 4, 1999).

Mr. Zehl's justifications for his actions—his passion for Calvin Howard's case and his desire to vigorously present that case to the jury, his fatigue during this four-week trial, and the rancor between counsel—do not excuse Mr. Zehl's behavior. The Court finds that Mr. Zehl's actions, both during the trial and during closing argument, amounted to bad-faith conduct. Although neither the Supreme Court nor the Fifth Circuit have specifically defined the bad-faith standard for purposes of a federal court's inherent authority to sanction, it is clear from the record in this case and the repeated instances of misconduct outlined in this Order and Reasons that Mr. Zehl acted in bad-faith.[88] Even if the Court found that Mr. Zehl's use of Exhibit 150, his use of the undisclosed deposition excerpt of Captain Godwin, his improper comments on Dr. Cenac's credibility, and his reference to defense objections during his closing argument were inadvertent and due more to his inexperience than to malice, Mr. Zehl's questioning the integrity of the Court and violating specific orders of the Court during closing argument are sufficient to support a finding of bad faith on his part. The Court finds it appropriate to sanction Mr. Zehl for his conduct in this case both to punish him and, more importantly, to deter similar conduct in the future. The Court hereby imposes monetary sanctions against Mr. Zehl personally in the amount of $1,000.00, payable to the Clerk of this Court. This sanction may not be paid by his law firm or charged to his client in any way.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Ryan Zehl is hereby personally sanctioned $1,000.00 for the conduct described above, payable to the Clerk of this Court.

---

[88] *See, e.g., Yelton v. PHI, Inc.*, 284 F.R.D. 374, 376 (E.D. La. 2012) (citing *Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc.*, 38 F.3d 1414, 1417 n.6 (5th Cir. 1994) (holding that district court "by implication" had made a finding of bad faith and improper motive based on five paragraphs specifically addressing plaintiff's conduct)).

Payment must be made payable to Clerk, United States District Court, and forwarded to the following address within 60 days of the date of this Order and Reasons:

U.S. CLERK'S OFFICE
500 POYDRAS STREET
ROOM C151
NEW ORLEANS, LOUISIANA 70130

**New Orleans, Louisiana, this 17th day of May, 2016.**

*Susie Morgan*
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**